IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

RORY D. VANSANT
    PETITIONER

    V.

BRENT THOMPSON
    RESPONDENT

NO: 25-cv-2438"B"(1)

PETITIONER'S ATTACHMENTS
TO HABEAS PETITION

NOTED: December 23rd 2025

ON PETITION FOR WRIT OF CERTIORARI TO

THE UNITED STATES COURT OF APPEALS FOR THE EASTERN DISTRICT

PETITION FOR WRIT OF CERTIORARI

**Pro-Se Petitioner**
**Rory D. VanSant #621247**
**Raymond LaBorde Correctional Center**
**Cajun 2 D2**
**1630 Prison Rd.**
**Cottonport, LA.71327**

1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

RORY D. VANSANT                                    NO: 25-cv-2438 "B"(1)
    PETITIONER

                                                   PETITIONER'S ATTACHMENTS
        V.                                         TO HABEAS PETITION

BRENT THOMPSON                                     NOTED: OCTOBER 17TH, 2025
    RESPONDENT

## ATTACHMENTS TO HABEAS PETITION

9(d). Grounds Raised on Direct Appeal

13.    Grounds For Relief:

Petitioner was denied effective assistance of counsel at various points of his trial process.

Support Fact:

Petitioner was charged with (2) counts of L.R.S. 14.78.1. He claimed his innocence from day one and has never veered from his testimony.

On May 8th, of 2008, Petitioner was picked up by Las Vegas Sheriff's Office when the Petitioner was applying for a bar card, at the Sheriff's Office, in order to keep working at the establishment that he was already employed at in Overton, NV. On May 28th 2008. Petitioner was then extradited to St. Tammany Parish when two sheriff's deputies picked him up and flew him back to St. Tammany. In June of that same year he was charged by Grand Jury Indictment, of two counts of La.R.S. 14:78.1. The first written Motion of Continuance was filed over 3 years into his indictment.

1

Petitioner remained in jail until trial on February 13th, 2014. The two counts were severed before trial, and the parish took the Petitioner to trial on what was actually count 2. At trial petitioner was found guilty of said charge and on May 5th, 2008. He was sentenced to thirty-five (35) years at hard labor in the Department of Corrections, without the benefit of probation, or parole. The Petitioner was placed into the custody of the Department of Corrections and sent to Raymond LaBorde Correctional Center in Avoyelles and has remained there since.

Now Comes Into Court, Petitioner, **Rory D. VanSant**, and enters into the court this Motion for Out of Time Post-Conviction pursuant to Article 930.8 A (1) for the following reasons,

(1) The conviction was obtained in violation of the constitution of the United States or the state of Louisiana;

(2) The court exceeded its jurisdiction;

and in support of said reasons offers the following to-wit:

The petitioner avers that he has been denied his constitutional rights, ***La Constitution Article I Section 13, United States Constitution, Amendment V, VI, and XIV*** right to effective assistance of counsel during the trial and on appeal. A cognizant bases for relief is thus stated in *C.Cr.P. Article 930.3 (1)*.

## STATEMENT OF JURISDICTION

Jurisdiction of this Court is invoked under Article V § 5 of the Constitution of the State of Louisiana of 1974.

## STATEMENT OF ISSUE

St Tammany's Public Defenders Office consistently preformed inadequately in their defense of Petitioner

and was extremely adversarial to the point that hid huge facts of the goings on, that were surrounding

Petitioners case. Their covering up of said facts should be considered malfeasance in office. They were

complicit with the Prosecution. His two attorneys of record should never have been harassed to the point

where one was fired and the other was scared to practice criminal law as it should be. It is because of this

reason and so many others that Petitioner believes his sentence should be vacated.


## BACKGROUND

On May 8th, of 2008, Petitioner was picked up by Las Vegas Sheriff's Office when the

Petitioner was applying for a bar card, at the Sheriff's Office, in order to keep working at the

establishment that he was already employed at in Overton, NV. On May 28[th,] 2008. Petitioner was then

extradited to St. Tammany Parish when two sheriff's deputies picked him up and flew him back to St.

Tammany. In June of that same year he was charged by Grand Jury Indictment, of two counts of

La.R.S. 14:78.1. The first written Motion of Continuance was filed over 3 years to his indictment.

Petitioner remained in jail until trial on February 13th, 2014. The two counts were severed before trial,

and the parish took the Petitioner to trial on what was actually count 2.  At trial petitioner was found

guilty of said charge and on May 5th, 2008. He was sentenced to thirty-five (35) years at hard labor in

the Department of Corrections, without the benefit of probation, or parole. The Petitioner was placed

into the custody of the Department of Corrections and sent to Raymond LaBorde Correctional Center

in Avoyelles and has remained there since.

3

## ARGUMENT

### Ground #1 Constructive Ineffectiveness Adversarial Defense Counsel

It is Petitioner's contention that his defense was not only deficient but was adversarial and sabotaged by the Public Defender's Office at each and every major point of his case. Petitioner had an inclination of what had gone on but never had proof of the internal workings of the Public Defenders Office until October 28th, 2024. It was at that date that Petitioner received newly discovered evidence; a letter from one of his attorney's of record, Kathryn F. Lafrentz, stating what had happened in his case with both herself and Petitioner's other attorney of record, Miss. Trisha Ward. Petitioner contends that his case would fall under the constructive ineffectiveness issues that are raised, which was set in motion , and states **"the right to effective assistance of counsel is the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing…….[I]f the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated."** The two-prong bar for petitioners to overcome in order to prove ineffective assistance of counsel, then does not need to be met, but the whole of the total lack of defense where there is various kinds of state interference, is looked at and as such does not need to overcome the second of the two-prong bar.

Petitioner contacted the A.C.L.U and the office from New Orleans and New York. The offices came out and investigated and concluded that the defendants were "routinely deprived of their due process rights and rights to effective assistance of counsel" The A.C.L.U. further alleged that the services offered by the 22nd Judicial District Defender Office "fail to meet well-established national and state ethical standards." The A.C.L.U specifically noted that public defenders in St. Tammany Parish

4

"are forced to carry grossly excessive caseloads each year," that the St. Tammany Parish office provided inadequate numbers of investigative staff, and that resources provided to the 22nd Public Defenders Office "are far less than those allocated to the District Attorneys' Office." The A.C.L.U. raised the issue of potential civil liability, saying that the deficiencies they had identified could result in 28 U.S.C.A. Sect. 1983 liability for the supervisors in the 22nd Public Defenders Office as well as the Louisiana Public Defender Board "for failure to ensure that rank-and-file defenders are providing meaningful representation at the critical stages of every case for which they are responsible." See **Exhibit B:** *Bureau of Justice Assistance 44 pg. Report pg.1*

*This report was specifically done because of a letter that Petitioner had sent to a number of agencies because of the Public Defender McGluckin situation. See Exhibit B.* Ms. Jean Faria of the Louisiana State Public Defender, submitted a letter to the Criminal Courts Technical Assistance Project at American University, in Washington, D.C. It was because of her actions that the preliminary assessment was done.  Although Ms. Faria's technical assistance request asked for a full-fledged evaluation of 22nd Public Defender Office's operations and performance. This grant was scheduled to terminate at the end of January 2012, and its remaining funds were limited. This preliminary assessment would also lay the foundation for a more comprehensive and in-depth review, should that prove necessary and funding become available. That funding never came; and what you have before you is the tip of the iceberg. The rest of the iceberg though, as in the real life, is under the waterline.

After a shuffling around of Public Defenders the petitioner was assigned John Hogue III. According to the minute entries there was not a written motion of continuance for three (3) years and Petitioner's attorney of record should have filed a Motion to Quash based on time limitations. If he would have done this the case would have been dismissed because the time had went over a year he then filed a written motion of continuance.

It is Petitioner's contention that he has had adversarial counsel at almost every point of his awaiting trial. Almost all of his attorneys worked against him at all times until the forgoing attorney's that are now mentioned. And because of their actually working for Petitioner they were met with opposition from every angle. As will be shown in the 3 page letter from Mrs. Lafrentz. **Exhibit A**

Sometime in 2012 attorney Kathryn Fernandez was assigned to his case to help John Lindner. who had just taken over the Public Defenders Office. John Lindner told the Petitioner that he was personally going to handle petitioner's case and that Kathryn was hired to assist him. Then later he was told that Kathryn was taking over. Later that year, Trisha Ward, an attorney from New Orleans that had 5 years experience in the Public Defenders Office, in New Orleans, was hired to take on the Petitioner's case along with other cases that were lagging in action with Kathryn assisting her. The A.C.L.U along with the Justice Department had sanctioned the Public Defender's lead attorney at that time, one John Simmons.

When Miss Ward and Miss Fernandez were hired they were told that the office was going through change and that they could be a part of that vital change. As you can see from **Exhibit A**: Mrs. Fernandez was excited to be able to be a part of a changing department. Once she got into the office, though her opinion quickly changed.

### *Ground #2 Petitioner Was Completely Under Represented at the Grand Jury Hearing:*

At the Grand Jury hearing the attorney of record never presented any rebuttal evidence nor even voiced an opinion. Would the Grand Jury have even considered the two counts that were presented to them?

To show the absolute disarray of the Public Defenders Office:

While he was at St. Tammany Parish Jail awaiting trial his case was addressed by no less than **5** Judges, **13** different Public Defenders, and **1** District Attorney. Petitioner contends that his defense was fraught with deficiencies from the start. One of his first attorneys, John McGluckin, first came to see the Petitioner at the jail and announced to the Petitioner that was was unable to meet with him at that time. He stated that he had a dental appointment. Petitioner could smell alcohol through the plexiglas partition, that separated the two. Attorney McGluckin was taken out of Petitioner's courtroom and Petitioner assumes that he was reassigned to working Washington Parish because he never saw him again. This was completely unacceptable.

Petitioner was so frightened that he filed a number of pro-se motions in 2009. It took until 2013 when he was convinced by counsel to rescind those motions. Never were his motions addressed until that time AND Petitioner should have never rescinded them.

### **Grounds #3 Petitioners' Counsel Should have Filed a Number of Motions to Help Sustain His Defense**

On or about June 10th, 2013 the Petitioner and Miss Ward went into court to present a series of motions. On that date; Ms. Ward withdrew a Daubert/Foret motion until a later date because she still did not have a total witness list from the DA. The Honorable Judge Burris saw a number on the Motion itself and asked if that was the number of motions that had been filed in the case. Miss Ward was clear; she stated that there was a number of motions that still had to be heard that were filed pro-se by the Petitioner, and that depending on the amount of money that the public defenders office was to give for expert witnesses and investigation, was dependent on the amount of motions that would be filed.

Judge Burris looked at the Petitioner and Miss Ward and said "Well I hope there are no frivolous motions filed here." Miss Ward said "Well let me assure you Judge that there are no frivolous motions filed here." Miss Ward told the Petitioner that she would be back to see the Petitioner on the following Monday. That Monday came and she never showed.

## Grounds #4 Petitioner's Counsel Should Have Never Been Fired and His Other Attorney Made to Quit Because of  Hostile Work Environment While Defending Petitioner

In newly discovered evidence; it was learned that Miss Ward was very briefly reassigned and then fired, because she had filed the series of motions to pursue a fair and impartial trial. It is Petitioners first contention that Miss Ward was fired from Petitioner's case because of these motions. It was learned that she was told not to file any motions, but in order to properly defend Petitioner she filed said motions. It was told to her that the Public Defenders Office did not want to upset the judge and keep continuing Petitioners' case but in order to properly defend a case a lawyer has to have time to effectively examine all leads and to have everything investigated properly and to vet out all possibilities. The lawyers previously did nothing to proceed the case forward. In turn these two women had to start from scratch.

In **Exhibit A** you can see that Miss. Fernandez experienced sexual harassment, and sexism from the start and witnessed racism and classism on a regular basis. She wound up quitting the public defenders office because of the situation there and not being able to defend the Petitioner, men and women in an adequate and effective process. The Public Defenders Office *"was"* complicit with not defending, with any type of adequate defense and was adversarial. The Public Defenders Office removed Miss. Ward from the Petitioner's case. They never asked the Petitioner if he wanted her removed nor even told him that she was fired, nor explained to him why she was removed. Petitioner

8

even told attorney Oliver Carriere, a lawyer assigned to him at the time, that he was more comfortable with Miss Ward and Mrs Fernandez and when Mr. Carriere asked if he wanted them back on his case Petitioner told him yes. Mr. Carriere told the Petitioner that he would get them back onto his case; but that never happened because, as his mother can attest to, she was told specifically by Miss Ward "They are trying to railroad Rory."

Petitioner has learned that the Public Defenders Office even threatened Miss. Ward to disbar her from her legal practice. She was told because she had Petitioner's files at her office in New Orleans. Petitioner would now like to know: who's files are they? Are they the possession of the Public Defenders Office or are they the Petitioner's files? Petitioner contends that these files are the property of the Petitioner for his defense and that were issued to the Public Defenders Office for his case. According to the ***Professional Code of Conduct Rule 1.16 (d)***: upon written request by client, the lawyer shall promptly release to the clients new lawyer, the entire file relating to the matter, if I am pro-se then the files would be released to myself. If this is the case the file then belongs to the Petitioner. Why was Petitioner's attorney of record being threatened with any legal action for just doing her job. Petitioner contends that she should have had all of the files that the public defenders office had, so that she could go over each and every detail on his case and then formulate Petitioner's defense and as to what motions to file.

To further the Petitioner's claims: Petitioner's docket was severed and was afterward prosecuted, even though the prosecution told Petitioner's sons' mother that they were not going to pursue the second count. This further prosecution led to the Petitioner going to a pretrial hearing and an offer was made to him by the prosecution. The offer was 5 years while agreeing to a plea of no contest. At that time the Petitioner agreed to plea to said deal if the Honorable Court would agree to hear his pro-se motion. The court then agreed. Petitioner then filed a timely pro-se motion to quash based on

time limitations. He argued that it had been over a year since the last written motion of continuance. The Honorable Judge looked into Petitioner's file. The looked back over it. Then the honorable judge said "I do not see any written motions of continuance in this file." This is Petitioner's file that the Clerk of Court maintains and "is" the file of record. His attorney of record promptly stated "I know that we filed a written motion of continuance!" This statement alone is proof in of itself that Petitioner's defense was adversarial. The judge then set another time to come back and hear this said Motion. The Court ushered the Petitioner out of the courtroom and placed him in an adjourning cell. When they brought Petitioner back in the court denied his motion. His lawyer Oliver Carriere made him sign his guilty plea and told him that they had found the written motion of continuance in the back. His plea was that in case anything happened to his first case that the case that he was pleading to would automatically be taken back.   Showing Adversarial Counsel Petitioners Counsel should have never spoke up at that time in opposition to Petitioner. A Motion for a Copy of the Verbatim Sentencing Transcript is in the District Court.

Petitioner now claims that these actions by the Public Defender's Office actions were bordering on criminal. Due to the ACLU from New York coming down to St. Tammany and then Deputy Director of the ACLU's Criminal Law Reform Project, Jason Williamson, the Department of Justice just went through a whole sanctioning of John Simmons for much of the same. The office did not change. It just continued under a different administration. ***Exhibit B: 44 pg. report by the Bureau of Justice Assistance.***

**Grounds #5 Failure to Investigate Caused a Number of Witnesses to be Lost**

Petitioner asserts that he was hindered from every aspect. Very, very little investigation was done by the office, His attorney's were give a list of witnesses to interview. None were interviewed, including Jack Tanner, a lieutenant at the St. Tammany Parish Sheriff's Office that worked an ongoing detail at the Walmart on Airport Rd., in Slidell. Mr. Tanner, due to the time it took to get Petitioner to trial, died in a car crash and if the investigation would have taken place before; then they would have had testimony of the exasperated problems that had gone on between Petitioner, his wife and her ex-in-laws. Mr. Tanner even advised Mr VanSant on how to deal with an eviction process that went on.

It is Petitioner's contention that the Parish thwarted his defense because of the microscopic eye that was placed on the Public Defenders Office. This began an adversarial defense for the Petitioner.

Another lawyer Linda Stadler was a witness that could have been questioned and her testimony would have shown that at one time Petitioner was trying to work with her, her father and the battered women's shelter there in Slidell along with the Slidell Police, to organize a Gun Show and Chili Cook-off, for the benefit of a Rape Crisis Center for Slidell since the closest crisis center is one that was in New Orleans at the time.

### Grounds #6 Failure to Hire Expert Witnesses

Petitioner also voiced that he wanted to have jury consultants employed in his case. Because of the complexities of his case and the almost immediate negative connotation associated with his charge it was going to be practically impossible to find an impartial jury. Petitioner voiced this opinion to each and every lawyer that was placed in his case. It was not ever taken seriously by any but the two women that were defending him at the one point.  Jury consultants or trial consultants provide a number of ways that they aid in the defense of their clients. Petitioner was even told that there were no such things as a criminal trial jury consultant here in Louisiana. So then Petitioner got names, numbers and addresses of jury consultants outside of Louisiana. He was especially trying to petition for the University of Alabama's jury consultants.

Petitioner just learned that there are jury consultants for criminal cases here in the state. Why was he told that there were none? He should have been able to petition the court for the monies for said consultants along with expert witnesses and private investigators, just as he had done earlier in 2009. If he actually had a defense team then they should have used these motions for his defense or filed ones on their own behalf. This also shows adversarial counsel.

It was not a strategic decision to not investigate. It was a lack of funding, and an overburdening of the private investigators that the public defender had and an adversarial atmosphere in the actual office. The investigators spent most of their time dealing with 72-hour hearings. They only investigated cases at or near trial. Petitioner sat for almost 6 years before trial. Private investigators never found the OCS case worker that worked the case and interviewed both Petitioner, his son and his wife, a week before they actually left the trailer that they were staying at. This would have proved that the trailer was in complete satisfactory condition when the investigator was there and was neither infested nor

12

unlivable. This was a major point of the prosecution. The fact that the trailer was damaged by Katrina and that the back bedroom was unlivable because of the tree that fell through the roof these facts and more were never brought up. Also the OCS case worker that worked the case, had the electric bills for the over 3 months that showed how much money was being paid out for electricity and that it was not just Petitioners electricity that Petitioner was paying for. This would have proven that the ex-in laws had called OCS to have his son removed from the home. They had already placed false charges on Petitioner previously. These facts would have impeached the testimony of one of the prosecutions major witnesses. The OCS investigator would have also testified that she told the Petitioner that if "any" other charges were levied, that the OCS office would no longer pursue anything.

The prosecution focused a lot of their case on the trailer that the Petitioner, his wife and his then 4 year old son lived in. When OCS came to inspect the trailer less than a week before he actually left the premises; he was completely exonerated by OCS of the accusations that were made by the grandparents of the alleged victim. If the trailer was so dilapidated then the OCS worker would have removed the Petitioner's son from this household but not only did she not remove his son but the worker even offered the Petitioner money to get him out of the residence sooner if he needed it. Petitioner did not need it though and moved at the end of that week most expediently. He left the deposit that would have covered any cleanup charges.

### Grounds #7 Destruction of Favorable Evidence

Never in trial did it come out that Petitioner had promised to take custody of his wife's' two daughters the week before the accusation was made by his accusers. The Public Defenders Office was directly responsible for the intentional spoliation of evidence; a DVD of a video deposition of his wife. Petitioner's mother was there when the video was filmed. When Petitioner was showed the disk, the scratches were so deep that they could not have come from shipping and handling. His brother, that made the video, is a semi-professional at making such DVDs' and had his producers card at Long Beach Charter Cablevision, where he had his own access cable TV show, "Alternative TV".

The Public Defenders Office even lost two complete suits that Petitioner's mother had brought out to him and then dropped off to the Public Defenders Office, in a suit bag with the Petitioner's name in big letters on the bag. He was constantly told that the office was going to purchase new suits for him. He was forced to go to trial with clothes that were not his and were off of some rack that the courthouse had. He was placed in khaki pants and a mismatched shirt and clip-on tie.

The Public Defenders Office should have then been indicted on a theft charge. Petitioner was never reimbursed for the clothing.

Miss Ward and Mrs Fernandez were both told that the department had no way to investigate witnesses or evidence outside of the state. Which there were two witnesses. Kathryn VanSant and Kathie Lee Davis. When Miss Ward pointed out ways in which the status quo was deficient, she was immediately met with opposition. Trisha Ward contravened a direct verbal order from her boss to withdraw the motions that she had filed in Petitioner's case.

Both attorney's stated that their only job was to go to trial with the information and resources that they had and not to **"litigate"** or **"investigate"** in preparation. They were told their only job was to

"**move the docket**." This is in direct violation of precedent which had a lawyer advise his client to plea bargain to an offense which the attorney had not investigated, that such conduct is always unreasonable. So too then should be, that an attorney told not to investigate would be, unreasonable also. Again, when Miss Ward filed the motions that she did in Petitioner's case, she was reassigned to another division for just a brief time, then ultimately fired. The atmosphere became so hostile by that point that Miss Fernandez stopped working there also. It is for these reasons and much more that Petitioner has filed this out of time post-conviction based on newly discovered evidence.

**Grounds #8 Failure to File Motions Favorable to Petitioner**

From that point Milton Massiter was assigned to his case. Mr Massiter told the defendant that he was not going to file "any" motion and that they were proceeding to trial. Petitioner never saw Mr. Massiter again. Then Petitioner was assigned Oliver Carriere, along with Amanda Trosclair and David Anderson. These attorneys never filed another Daubert Motion  even though the expert witness was not the investigating woman from Childrens Services. These attorneys never had anything investigated, didn't argue to keep the two counts from being severed, never hired any expert witnesses of their own, never even found the woman at OCS that had investigated Petitioner previously.  Defense counsel's preparation for trial amounted to "total failure to actively advocate his clients cause.  A purportedly strategic decision is not objectively reasonable when the attorney has failed to investigate his options and make a reasonable choice between them". Petitioner questions how hard it would have been to see the OCS records as to the date that the investigation happened and see who was actually working for the OCS office? If they would have; they could have interviewed these people,  had the actual woman that had worked on the Petitioner's case, and had her as a defense witness. She would have had a completely different view of the goings on and shed new light as to what she had as evidence, ie. the past electricity bills.

**Grounds #9 Petitioner Never Had an Opportunity to Defend His Self Properly.**

*The 6th Amendment guarantee's a criminal defendant reasonably effective assistance of counsel at trial..* A claim of ineffective assistance of counsel is to be assessed by two-prong test

Petitioner must show that counsel's performance was deficient and that the deficiency prejudiced him. Counsel's performance is ineffective when it can be shown that he made errors so serious that counsel was not functioning as the "counsel" guaranteed to the Petitioner .  Counsel's

deficient performance will have prejudiced the Petitioner is he shows that the error(s) were so serious as to deprive him of a fair trial. To carry this burden, the Petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional error(s), the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome."

Some courts have set a ridged standard requiring the use of an outcome determinative test in making out a finding of prejudice caused by ineffective assistance of counsel. However, Petitioner's burden is not that overwhelming. This is specifically disavowed use of an outcome determinative test, "...Petitioner must only show a reasonable probability of a different outcome." In support of prong #1 of the requirement: Petitioner contends that his appointed/hired counsel rendered ineffective assistance when he failed to introduce evidence to the Grand Jury in support of his client. Furthermore, Petitioner would add the facts in support of his claim for consideration by this Honorable Court. Keeping the above in mind, it is clear that counsel's deficient performance prejudiced the Petitioner's trial, making it fundamentally unfair, resulting in a manifestation of injustice.

The special value of the "right to counsel is the right to effective assistance of counsel"' and unless the accused received effective assistance of counsel, " a serious risk of error infects the effect of the trial itself.". The pretrial investigation, principally because it proves the basis upon which most of the defense must rest, is perhaps the most critical stage of an attorney's preparation.  In addition, " An attorney does not provide effective assistance if he fails to investigate sources of evidence which may be helpful to the defense."  Notice, it is not a requirement that the evidence be helpful to the defense, just the probability that it "may" be helpful proves counsel ineffective for not investigating.

Attorney for the defense clearly has a duty to familiarize himself with discovery materials provided by the State.  "Counsel may not sit by thinking that an investigation would be fruitless."

17

Petitioner contends that his defense was greatly hindered by counsel's failure to perform his duties in investigating his case. The Court has held: "Because the defense counsel, in preparing the case, we have insisted that effective counsel conduct a reasonable amount of pretrial investigation."

### Grounds #10 Improper Severance

Counsel should have objected to the severance of charges. The two charges were on one indictment and should have been prosecuted as such but since the prosecution was afraid of taking the actual first charge, because of the inconsistencies in the statements of the first alleged victim. The prosecution was afraid that their case was in jeopardy. They knew if they could get the defendant on the one count they would have a better chance on the second. This was a definite trial strategy by the Prosecution and as such the defense counsel should have objected to said severance because it unfairly prejudiced the Petitioner. They did so because if they tried them together their case would have been overturned because of the testimony of the other supposed victim and the inconsistencies with her testimony and her demeanor.

The above facts positively show that Petitioner's counsel failed to investigate the case, because counsel allowed a trial to proceed without making a timely objection to trial by court without legally acquired jurisdiction. Petitioner avers that if counsel would have investigated and read over the indictment/information he would have clearly known it was invalid /insufficient/ defective and that he needed to file a Motion to Quash pursuant to such. The only other reason that could be given for counsel's failure is that he is unfamiliar with the La. Constitution (1974) and the U.S. Constitution, nor current State law for filing such Motion to Quash and/or that a timely objection to such is required, or counsel made his own private decision to not protect his client's rights. If this case, this failure by counsel clearly deprived Petitioner of Effective Assistance of Counsel and shows counsel not familiar

with State law, or constitutional law, or significant points of relevance.  Errors that indicate ignorance of basic procedures constitutes Ineffective Assistance of Counsel.

It is only logical from the above indications that counsel was not familiar with the basic procedures of current State law, nor constitutional law, because he was not acting as the counsel guaranteed by the 6th Amendment when he failed to file a Motion to Quash and for failing to make a timely objection to a trial by court without jurisdiction. Had counsel timely objected, before trial, he would have at least preserved these errors for appeal.

Petitioner contends that had, John Hogue, filed the Motion to Quash, the Court would have likely quashed the instrument, and the Petitioner would not stand convicted for his charge(s). Therefore there is more than a reasonable probability that the outcome of the proceedings would have been different. However, Counsel failed to file a Motion to Quash or make a timely objection, which allowed trial in which the Trial Court had no jurisdiction/authority to try Petitioner thereby rendering Petitioner's conviction, sentence, and incarceration unconstitutional and illegal. Petitioner contends that due to counsel's negligence, the Court was not given the opportunity to rule on any objection to the trial without jurisdiction, nor given the opportunity to quash said defective instrument. These failures worked to Petitioner's disadvantage and highly to his prejudice. The courts would have found the defendant was denied effective assistance of counsel because of a lack of pretrial preparation where counsel failed to file pretrial motions.

In the 5th Circuit, the standard for effective assistance of counsel requires to be reasonably likely to render and rendering effective assistance.  This means that an attorney must not be qualified by training, but he must actually perform services that are reasonably adequate. Counsel is required to, for want of a better phrase, turn over the "large stones" and "pursue the obvious issues".

.

Effectiveness of counsel must be tested not only by review of available trial court record, but by hearing, to determine the truthfulness of Petitioner's allegations concerning pretrial presentation of counsel. When a hearing is necessary to protect Petitioner's Due Process rights, then failure to hold a hearing would be abuse of discretion. In the case *sub judice*, the decision by counsel in not filing a timely objections before trial or at the time of trial, to a trial held wholly without jurisdiction, was not a decision about trial strategy, but a decision to do ***"nothing or as little as possible in advocating his client's cause."***

It cannot be seriously argued that counsel's failure to perform his duties in the instant case did not hinder the Petitioner's defense, as Petitioner was not properly informed of the nature and cause of the accusation brought against him and was therefore, denied the right to prepare and present an adequate defense to the pending charge(s) against the Petitioner. Therefore, Petitioner contends that he has shown, but for counsel's unprofessional conduct/errors there is a reasonable probability that the outcome would have been different.

Petitioner submits that he was denied a fundamentally fair and impartial trial, and in addition, effective assistance of counsel, even adversarial counsel. Petitioner has shown without a doubt counsel's failures worked to his prejudice and absent said errors/failure there exist a reasonable probability of a different outcome. Therefore, relief requested herein should be granted and Petitioner's release from illegal and unconstitutional incarceration be ordered immediately and without further delay or at the very least a Dorthy hearing.

**Grounds #11 Petitioner Also Asserts that His Appellate Attorney was Deficient**

1) Mary Roper, Petitioner's Appellate Attorney, never came to see her client to speak about the case, she never set up a phone call in order to go over the complexities of Petitioner's case even though Petitioner mailed her and explained to her that he did not want to mail out his concerns and had numerous claims that were never addressed in his Appellate claim. She wanted him to place everything in a letter to her but the issues were to numerous and to sensitive to be able to do so through the mail. Petitioner could have had enough phone conversations if she couldn't meet in person.

### *PETITIONER HAS PROCEEDED WITH ALL DUE DILIGENCE*

*Article 1 of the Louisiana Constitution § 21    Writ of Habeas Corpus   " The writ of habeas corpus shall not be suspended."*

Petitioner has been trying to get this evidence ever since before he was convicted. Petitioner knew there was a problem with the Public Defenders Office and even had the A.C.L.U from New York ready to file suit in his stead and 11 others, only to have John Lindner talk them out of doing so. Jason Williamson Esq., Deputy Director of the ACLU's Criminal Law Reform Project, was one of the people that was coming out from New York to speak with a number of inmates. His office set in motion the **44 pg. Report** that you have in front of you now. Done on the A.C.L.U.'s behalf by the **Bureau of Justice Assistance**.

He has worked with **due diligence** to attain said newly discovered material. He has looked and has written to whoever he could think of and did not want to just file something with no bearing. He has logged time in at first when he came R.L.C.C. at the law library and filed a motion for leave and also a motion to Stay. He was trying to file a Supplemental Brief in addition to the one that Appellate Attorney Mary Roper filed. These motions were never ruled upon, that he knows of, because he never

received any legal mail whatsoever and the Appellate case was ruled upon. Miss Roper never offered to file the Supreme Writ.

Petitioner tried to find each of the lawyers that had worked on his case to discuss the eccentricities and complexities of said case. It was not until 12 year later, Petitioner then met, Hannah Groedel, a lawyer at Tulane Law School, that happened to mention the name of Katie Schwartzman, to another one of her colleagues. Petitioner then asked if that was the same Katie Schwartzman that worked for the New Orleans office of the A.C.L.U. Miss Groedel said "yes". Miss Schwartzman's name then appeared to the Petitioner while he was researching another case and low and behold it was with the Advocacy Center. Petitioner then asked Miss Groedel to ask Miss Schwartzman if she knew Miss Fernandez. If she had worked with her and if she knew where the Petitioner could write to her? Miss Schwartzman then emailed the place she was then employed with. Which was the Pro-bono Project New Orleans. After one letter to her she responded with the letter in front of you: **Exhibit A.**

He only recently found her name associated with the Advocacy Center in New Orleans and had written Miss Fernandez there, but they sent him a letter telling him that she no longer worked there and that they could not give him any information on where she went.

On October 28th, 2024 Petitioner received Ms. Lafrentz's letter and since then has been busy putting this Out of Time Post-Conviction and Writ together along with the other evidence that is now in the possession of the Honorable Court.

## **STANDARD OF REVIEW**

R.S. 15:142 Legislative findings

     A. Article 1, Section 13 of the Constitution of Louisiana, in accordance with the states obligation under the Sixth and Fourteenth Amendment of the United States Constitution,

     provides that at "each stage of the proceedings, every person is entitled to the assistance of counsel of his choice, or appointed by the court if he is indigent and charged with an offense punishable by imprisonment." Section 13 further mandates that the legislature to provide for the general framework and the resources necessary to provide for the delivery of public defender services in the state.

     B. In recognition of is mandate under both the United States and Louisiana Constitutions, the legislature enacts the Louisiana Public Defender Act of 2007 to provide for all of the following:

     (1) Ensuring that adequate public funding of the right of counsel is provided and managed in a cost effective and fiscally responsible manner.

     (2) Ensuring that the public defender system is free from undue political and judicial interference and free of conflicts of interest.

     (3) Establishing  flexible delivery system that is responsive to and respectful of judicial variance and local community needs and interests.

     (4) Providing that the right to counsel is delivered by qualified and competent counsel in a manner that is fair and consistent throughout the state.

     (5) Providing for statewide oversight with the objective that all indigent criminal defendants who are eligible to have appointed counsel at public expense receive effective assistance of counsel at each critical stage of the proceeding.

(6) Providing for the ability to collect and verify objective statistical data on public defense workload and other critical data needed to assist state policy makers in making informed decisions on the appropriate funding levels to ensure adequate service delivery system.

(7) Providing for the development of uniform binding standards and guidelines for the delivery of public defender services and for an effective management system to monitor and enforce compliance with such standards and guidelines.

C. The legislature recognizes that the uniform application of statewide standards and guidelines to be established by the Louisiana Public Defender Board is important means of achieving a more consistent delivery of quality representation throughout the state. To that end, it is the express intention of the legislature that the Louisiana Public Defender Act of 2007 is designed, to the extent practicable and feasible, to provide for the delivery of public defender services which meet the requirements established by Strickland v. Washington, and its progeny as adopted by the Louisiana Supreme Court.

D. The legislature recognizes that the Louisiana Supreme Court in State v. Citizen, authorized trial judges to halt prosecutions in capital cases, upon motion of defense counsel, until adequate funding is provided to ensure an adequate defense, and it is the express intention of the legislature to ensure adequate resources, consistent with the Citizen opinion, which allow prosecutions in such cases to continue to conclusion resulting in verdicts that are fair, correct, swift, and final.

E. It is the express intentions of the legislature that the Louisiana Public Defender Act of 2007 is designed to provide effective legal representation to criminal defendants who or unable to afford an attorney, consistent with the right to counsel in our criminal courts, mindful of the need for law and order and an appreciation of the victims' rights.

F. It is the intentions of the legislature that the Louisiana Public Defender Board respect local differences in practice and custom regarding the delivery of public defender services. The provisions of this Part are to be construed to preserve the operation of district public defender programs which

24

provide effective assistance of counsel and meet performance standards in whatever form of delivery that local district has adopted, provided that method of delivery is consistent with standards and guidelines adopted by the board pursuant to rules and as required by statute.

## **CONCLUSION**

It is Petitioners contention that he was completely failed by the criminal justice system in St. Tammany by being provided an ineffective defense. He was hindered from the very start. His defense was by far subpar to what should have been there for him. He was not asking for a supreme defense but he expected both adequate and effective assistance of counsel. He was thwarted at every instance and when two women, that actually believed in him and started to provide both an adequate and effective defense, Trisha Ward was fired for doing her job. Kathryn Fernandez was so traumatized that she went into civil law and told the Petitioners mother that she was afraid to be placed back on the Petitioner's case, because of the fear of repercussions of the Parish. The Parish Public Defenders were tainted from the start and did not plan to adequately defend the Petitioner from the beginning. The office was adversarial at every juncture. For this reason Petitioner cites *Cronic* as his total lack of defense and actual firing of one woman and made the other quit under duress. They then placed three attorneys that were against his defense from the start and adversarial at every major stage of his defense.

Respectfully Submitted,

Rory D. VanSant #621247 C2D2
Raymond LaBorde Correctional Center
1630 Prison Rd.
Cottonport, LA. 71327

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

RORY D. VANSANT
  PETITIONER

V.

BRENT THOMPSON
  RESPONDENT

NO:

PETITIONER'S ATTACHMENTS
TO HABEAS PETITION

NOTED: OCTOBER 27TH, 2025

_____

**Filed:**

_____

**Deputy Clerk**

### Certificate of Service

I hereby certify that I have served a copy of a 28 U.S.C. 2254 Writ of Habeas

Corpus, the documents on all counsels of record either in person or by mailing it postage

prepaid on this 17th day of December, 2025.

Rory D. VanSant #621247
Raymond LaBorde Correctional Center
1630 Prison Rd.
Cottonport, LA. 71327